# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JACOBSON WAREHOUSE COMPANY, )
INC., d/b/a XPO LOGISTICS SUPPLY )
CHAIN, )
    )
    Plaintiff/Counterclaim Defendant, )
    )
v. )        No. 4:17-CV-00764 JAR
    )
SCHNUCK MARKETS, INC., )
    )
    Defendant/Counterclaim Plaintiff. )

## MEMORANDUM AND ORDER

This matter is before the Court on the following motions: Defendant Schnuck Markets, Inc. ("Schnuck")'s Motion to Dismiss Counts IV and V of Plaintiff's Complaint (Doc. No. 24); Plaintiff/Counterclaim Defendant Jacobson Warehouse Co., Inc., d/b/a/ XPO Logistics Supply Chain ("XPO")'s Motion to Dismiss Counts III, IV, and V of Defendant/Counterclaim Plaintiff's Counterclaim (Doc. No. 37); and Plaintiff's Motion for Judgment on the Pleadings – Counts I and II of Counterclaim (Doc. No. 39). The motions are fully briefed and ready for disposition.

## I.    Background[1]

Plaintiff XPO is a global logistics company providing warehousing and related logistical services to clients. (Complaint ("Compl."), Doc. No. 1 at ¶¶ 1, 7.) Defendant Schnuck is a supermarket retailer that owns and operates "Schnucks" branded grocery stores. (Compl. at ¶¶ 1, 8.) In May 2015, XPO and Schnuck entered into an Amended and Restated Operating Agreement (the "Agreement," Doc. No. 8-1) setting forth the terms and conditions under which

---

[1] The facts are taken from the complaint and presumed to be true for the purpose of resolving the pending motions.

XPO would provide certain warehouse management services for a new distribution facility Schnuck was designing (Compl. at ¶¶ 1, 9, 10.) In the Agreement, Schnuck agreed to pay XPO a weekly Warehousing Fee in exchange for its warehouse management services, and to provide information and other assistance required by XPO to perform those services. (Compl. at ¶¶ 10, 11, 19, 23.)

XPO alleges that Schnuck subsequently breached its contractual and other obligations in at least three ways: (1) by failing to properly equip and furnish the new warehouse facility; (2) by failing to provide necessary information or otherwise cooperate with XPO, thereby materially impeding XPO's ability to manage the warehouse facility; and (3) by withholding, without cause or justification, fees owed to XPO for its services. On February 8, 2017, XPO notified Schnuck that it was in material default of its obligations and that XPO was terminating the Agreement. (Compl. at ¶ 28.) On February 14, 2017, Schnuck responded by purporting to terminate the Agreement due to XPO's alleged breaches of the Agreement. (Compl. at ¶ 29.)

On February 17, 2017, XPO filed its Complaint against Schnuck seeking damages and a declaratory judgment stating that Schnuck is in breach of its obligations, owes XPO for services rendered, and that XPO validly terminated the contract. The complaint asserts causes of action for breach of contract (Count I); declaratory judgment (Count II); action on account (Count III); quantum meruit (Count IV); and unjust enrichment (Count V). Schnuck counterclaims for breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); negligence (Count III); fraud (Count IV); conversion (Count V); and breach of contract – transition services agreement (Count VI). (First Amended Counterclaim ("FAC"), Doc. No. 59.)

## II.    Discussion

### A.  Motions to dismiss

In ruling on a motion to dismiss, the Court assumes all facts alleged in the complaint are true, and liberally construes the complaint in the light most favorable to the plaintiff. <u>Eckert v. Titan Tire Corp.</u>, 514 F.3d 801, 806 (8th Cir. 2008). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 570 (2007). "Further, documents attached to or incorporated within a complaint are considered part of the pleadings, and courts may look at such documents for all purposes." <u>Brown v. Medtronic, Inc.</u>, 628 F.3d 451, 459–60 (8th Cir. 2010).

### 1.  Schnuck's motion to dismiss Counts IV and V of complaint

In its quantum meruit claim (Count IV), XPO alleges that: Schnuck requested XPO manage and operate the facility; XPO conferred a benefit upon Schnuck by managing and operating the facility; Schnuck appreciated that a benefit was conferred, including but not limited to executing the Agreement and, for a time, by fully paying the weekly Warehousing Fees; Schnuck's acceptance and retention of the benefit of XPO's management and operation of the Facility is inequitable and unjust under the circumstances as Schnuck has not paid for the services XPO provided; and XPO has been unjustly enriched by its acceptance and retention of the services rendered by XPO to manage and operate the Facility without rendering full payment for the same. (Compl. at ¶¶ 49-53.) XPO further alleges that the services it provided had a fair and reasonable value of "not less than the amount of all unpaid Warehousing Fees." (Compl. at ¶ 54.) XPO's unjust enrichment claim (Count V) is similarly pled. (Compl. at ¶¶ 56-61.)

In support of its motion to dismiss, Schnuck argues that quasi-contractual claims like quantum meruit and unjust enrichment cannot be based – even at the pleadings stage – on the

terms and benefits conferred by an express contract. (Doc. No. 25 at 3-5.) XPO responds that while a plaintiff cannot recover on both an express contract and quasi-contractual claim, under the Federal Rules of Civil Procedure, quasi-contractual claims may be pled as alternative relief to breach of an express contract. (Doc. No. 33 at 4-5.) XPO further responds that neither of its quasi-contractual claims rely upon or presuppose the existence of the Agreement; the only references to the Agreement or Warehousing Fees were to show that Schnuck appreciated the benefit XPO conferred and to state that the value of the benefit was worth "no less than" the Warehouse Fees. (Id. at 6-10.) In reply, Schnuck argues that since neither party disputes the existence and validity of the Agreement, XPO's quasi-contractual claims cannot lie. (Doc. No. 41 at 3-4.)

As a rule, a plaintiff cannot pursue quasi-contractual claims where there is an express contract between the parties. Prime Aid Pharmacy Corp. v. Express Scripts, No. 4:16-CV-1237-CEJ, 2017 WL 2021082, at *6 (E.D. Mo. May 12, 2017) (citing Affordable Communities of Missouri v. Fed. Nat. Mortg. Assn, 714 F.3d 1069, 1077 (8th Cir. 2013)). Here, there is no dispute that a contract exists; XPO is asserting claims based on an alleged breach of the Agreement. Under the federal notice pleading standards, however, a party may plead claims in the alternative, even if the claims are inconsistent. See Fed. R. Civ. P. 8(d)(2); Volz v. Provider Plus, Inc., No. 4:15-CV-0256-TCM, 2015 WL 3621113, at *2 (E.D. Mo. June 9, 2015). A review of the complaint indicates that this is not what XPO is actually doing. In Counts IV and V, XPO pleads the elements of a contract (perhaps implied-in-fact) to manage and operate the Facility, and the damages it seeks to recover, i.e., "the balance of all unpaid Warehousing Fees, plus pre- and post-judgment interests, costs of suit and attorneys' fees," are the same damages sought in its contract claims. Further, XPO has incorporated its breach of contract allegations into its quasi-

contract claims ("XPO repeats and incorporates herein by reference the allegations set forth [above]"). (See Compl. at ¶¶ 48, 55.) XPO has not provided a basis for distinguishing its claims for unjust enrichment and quantum meruit from its contract claims, or explained how these claims are truly "alternative," given that there is no contention that the Agreement is somehow unenforceable. As pled, Counts IV and V must be dismissed. Accordingly, Schnuck's motion to dismiss Counts IV and V of the Complaint will be granted and XPO's claims for quantum meruit and unjust enrichment will be dismissed without prejudice.

**2. XPO's motion to dismiss Counts III, IV and V of Schnuck's Counterclaim**

**a. Negligence (Count III)**

Schnuck alleges that XPO was negligent in operating the Facility. Specifically, Schnuck claims that XPO breached its duty of care by "failing to conduct its operations pursuant to prevailing warehouse industry practices and inadequately planning, hiring, training, staffing, and supervising at the Facility." (FAC at ¶¶ 81-82.) XPO argues that Schnuck's negligence claim should be dismissed under the economic loss doctrine because it is not independent of its breach of contract claim; both claims reference the same subject matter of the Agreement – management of the Facility, and the same standard of care – "prevailing warehouse industry standards." (Doc. No. 38 at 8.) Schnuck responds that the doctrine does not apply because the parties contractually created a relationship and status under which XPO is liable in negligence for its acts and omissions. (Doc. No. 45 at 2-7.) Schnuck further responds that even if the economic doctrine applied, Missouri recognizes an exception in cases involving the negligent rendition of services by a professional like XPO. (Id. at 7.)

The economic loss doctrine prohibits a plaintiff from seeking to recover in tort for economic losses that are contractual in nature. Trademark Med., LLC v. Birchwood Labs., Inc.,

22 F. Supp. 3d 998, 1002 (E.D. Mo. 2014); Self v. Equilon Enterprises, LLC, No. 4:00-CV-1903-TIA, 2005 WL 3763533, at *8 (E.D. Mo. Mar. 30, 2005). The doctrine exists to protect the integrity of the bargaining process, through which the parties have allocated the costs and risks. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 882 (8th Cir. 2000).

It is true that XPO agreed to adhere to performance requirements and key performance indicators as set forth in the Agreement. (Doc. No. 8-1 at Section 2(a)(iii); Sections 6(d), 6(g), 6(i)). However, "[w]hile a mere breach of contract does not provide a basis for tort liability, the negligent act or omission which breaches the contract may serve as a basis for an action in tort." Baily Int'l, Inc. v. Harcros Chemicals, Inc., No. 4:14-CV-1708-JAR, 2015 WL 1781672, at *2 (E.D. Mo. Apr. 15, 2015) (quoting Union Elec. Co. v. Chicago Bridge & Iron Co., No. 4:14-CV-31-RWS, 2015 WL 1262941, at *6 (E.D. Mo. Mar. 19, 2015)). "If the duty arises solely from the contract, the action is contractual. The action may be in tort, however, if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement." Id.

Here, Schnuck alleges that XPO was obligated to "perform the services necessary for the proper, accurate and efficient operation of the Facility" and to perform those services "in a good, professional, workmanlike, expeditious, and economical manner, consistent with the most efficient operation of the warehouse in accordance with the standards and prevailing practices in the warehouse industry." (FAC at ¶¶ 24, 26.) Thus, Schnuck's negligence claim does not arise solely in contract and will not be dismissed on this basis. See Union Elec., 2015 WL 1262941, at *6.

Moreover, where, as here, contracting parties "require the exercise of reasonable skill, diligence, and care in the handling of business given over or entrusted to" a defendant, a special

relationship or status is created by their contract. <u>Owen Cont'l Dev., LLC v. Vill. Green Mgmt. Co.</u>, No. 4:11-CV-1195-FRB, 2011 WL 5330412, at *3 (E.D. Mo. Nov. 4, 2011) (quoting <u>Autry Morlan Chevrolet, Cadillac, Inc. v. RJF Agencies, Inc.</u>, 332 S.W.3d 184, 193 (Mo. Ct. App. 2010)). A tort action may be pursued "if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement." <u>Id</u>. (quoting <u>Business Men's Assurance Co. of Am. v. Graham</u>, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994)). In an action by a bailor against the bailee, the bailor may proceed on alternate theories of general negligence of the bailee, specific negligence of the bailee, or breach of the bailment contract. <u>Inst. of London Underwriters v. Eagle Boats, Ltd.</u>, 918 F. Supp. 297, 299–300 (E.D. Mo. 1996) (internal citations omitted). The duty of the bailee is to exercise ordinary care in the handling and safekeeping of the bailed property. <u>Id</u>. (internal citations omitted).

Schnuck further asserts that because XPO provided professional services to Schnuck and held itself out as a professional by representing it was skilled in the warehousing business and capable of operating the Facility consistently with prevailing practices in the warehousing industry, the professional services exception to the economic loss doctrine applies. (Doc. No. 45 at 7.) This exception is applied to negligence claims involving defendants who have been held to a professional, rather than an ordinary, standard of care and who have provided professional services to the plaintiff. <u>JR14, LLC v. Jetcorp Tech. Servs., Inc.</u>, No. 4:17-CV-1469-RWS, 2017 WL 3720075, at *1 (E.D. Mo. Aug. 29, 2017).

Given these allegations, it would be premature at this stage of the proceedings to conclude that Schnuck's negligence claim arises solely in contract and dismiss it as barred by the economic loss doctrine. Accordingly, XPO's motion to dismiss Schnuck's negligence as barred by the economic loss doctrine will be denied. <u>Id</u>. at *2.

Next, XPO argues that Schnuck's negligence claim should be dismissed to the extent it seeks damages barred by a Limitation of Liability provision in the Agreement. (Doc. No. 38 at 5-7.) Section 5(b) provides:

> [U]nless otherwise prohibited by law, ***neither party shall be liable for incidental or consequential damages or indirect, special or punitive damages***. Notwithstanding the foregoing limitations on types of damages, in the event that XPO would otherwise be liable to Schnucks for consequential, indirect, special or punitive damages, XPO shall be liable to Schnucks for such damages up to Schnucks' self-insured retention under any applicable insurance policy maintained by Schnucks, not to exceed Five Hundred Thousand Dollars ($500,000)[.]

(Agreement, Doc. No. 8-1 at § 5(b)) (Emphasis added). XPO contends this provision is an unambiguous and broad waiver that bars either party from seeking the enumerated categories of damages. Schnuck contends that Section 5(b) only applies to contractual claims under the Agreement, and does not waive liability for damages consequential to a negligence claim. (Doc. No. 45 at 8-10).[2]

It is well-settled in Missouri that sophisticated business entities may contractually limit future remedies. <u>Sports Capital Holding, LLC v. Schindler Elevator Corp.</u>, No. 4:12-CV-1108-SNLJ, 2014 WL 1400159, at *2-3 (E.D. Mo. Apr. 10, 2014) (citing <u>Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.</u>, 59 S.W.3d 505, 508 (Mo. 2001)). Contractual limitations of liability (including negligence liability) for consequential damages do not violate public policy where the language is "clear, unambiguous, unmistakable, and conspicuous." <u>Purcell Tire</u>, 59 S.W.3d at 509; <u>see also</u> <u>Roy A. Elam Masonry, Inc. v. Fru-Con Constr. Corp.</u>, 922 S.W.2d 783, 791 (Mo. Ct. App. 1996) ("Provisions in private contracts limiting or excluding liability for consequential damage have been held not violative of public policy, provided the limitation or exclusion was not unconscionable."). Notably, Schnuck does not contest the validity of the provision.

---

[2] Both parties incorporate by reference their arguments in support of and in opposition to XPO's Motion for Judgment on the Pleadings (Doc. No. 46), discussed <u>infra</u>.

"The cardinal principle" of contract interpretation is "to ascertain the intention of the parties and to give effect to that intent." Schnuck Markets, Inc. v. First Data Merch. Data Servs. Corp., 86 F. Supp. 3d 1055, 1064 (E.D. Mo. 2015) (quoting Monarch Fire Protection District of St. Louis County, Missouri v. Freedom Consulting & Auditing Services, Inc., 644 F.3d 633, 638 (8th Cir. 2011)). When interpreting a contract, the Court uses "the plain, ordinary, and usual meaning of the contract's words" and considers the "whole document." Id. If a contract is unambiguous, the "intent of the parties will be gathered solely from the terms of the contract." Id. Where, as here, the parties are experienced and sophisticated businesses with equal bargaining positions, the language they have mutually negotiated and agreed to is the best evidence of what they intended. Id.

In support of its position, Schnuck focuses on the phrase "under this Agreement" and argues that the plain language of Section 5(b) only covers contractual losses and liabilities. (Doc. No. 45 at 9.) Section 5(b) contains both an indemnification provision and a limitation of liability provision.[3] The language Schnuck relies on appears in the first sentence of Section 5(b)

_____

[3] Section 5(b) reads as follows in its entirety:

> Subject to its applicable insurance limit(s), each party shall indemnify and hold the other and its representatives harmless from and against all claims, liabilities, losses, damages and expenses (including reasonable attorneys' fees and expenses) incurred or suffered by any of them as a result of or in connection with (i) any breach of any of their respective obligations **under this Agreement** or (ii) **the negligence or willful misconduct of the indemnifying party or its representatives.** In addition, XPO shall defend, indemnify and hold Schnucks harmless from and against all claims, liabilities, losses, damages and expenses made and/or assessed by the landlord of the Facility (including reasonable attorneys' fees and expenses) and incurred or suffered by Schnucks and its representatives as a result of or in connection with XPO's breach of this Agreement, willful misconduct, negligent acts or negligent omissions. Schnucks and XPO each waive their rights of subrogation against each other, both for themselves and their insurers. Except for their respective indemnification obligations hereunder, as limited herein, unless otherwise prohibited by law, neither party shall be liable for incidental or consequential damages or indirect, special or punitive damages. Notwithstanding the foregoing limitations on types of damages, in the event that XPO would otherwise be liable to Schnucks for consequential,

regarding the parties' indemnification obligations; it does not appear in the limitation of liability. Moreover, the sentence concludes with, "or (ii) the negligence or willful misconduct of the indemnifying party or its representatives," indicating that the parties contemplated such claims. The limitation of liability, which immediately follows, bars enumerated categories of damages, without reference to specific legal theories or causes of action that might give rise to such damages. See Purcell, 59 S.W.3d at 509 ("Sophisticated businesses that negotiate at arm's length may limit liability without specifically mentioning 'negligence,' 'fault,' or 'an equivalent.'").

Further, other provisions of the Agreement expressly limit XPO's liability to direct damages. See Schnuck Markets, 86 F. Supp. 3d at 1064 (when interpreting a contract, the Court considers the "whole document."). Section 5(a) states that "[w]here XPO is otherwise liable under this Agreement for loss of, or damage to inventory, said liability shall be limited to the actual cost of the inventory lost or damaged based on the replacement cost for said inventory." (Agreement at § 5(a)(i)). Section 6(h), which sets forth inventory claim procedures, also states that XPO is only liable for the "replacement cost" of inventory, even when such losses are due to XPO's "negligence or willful misconduct." Id. at § 6(h). When read in context and as a whole, it would be unreasonable to interpret Section 5(b) to allow Schnuck to recover consequential or indirect, special or punitive damages for XPO's alleged negligence (i.e., mishandling of inventory) when other provisions of the Agreement clearly limit it to direct damages in the form

---

indirect, special or punitive damages, XPO shall be liable to Schnucks for such damages up to Schnucks' self-insured retention under any applicable policy maintained by Schnucks, not to exceed Five Hundred Thousand Dollars ($500,000) (the "SIR Damages") during each of the Term and the Renewal Term, as set forth in the next sentence. XPO's obligation to reimburse Schnucks for up to Five Hundred Thousand Dollars ($500,000) in SIR Damages shall not exceed: (i) in the aggregate, Five Hundred Thousand Dollars ($500,000) for any and all acts occurring during the Term of this Agreement; and (ii) in the aggregate, Five Hundred Thousand Dollars ($500,000) for any and all acts occurring during the Renewal Term (if any) of this Agreement. (Emphasis added.)

of replacement costs. Rather, it is clear from the plain language of Section 5(b) that the parties intended the limitation of liability to apply to negligence claims and any other claims seeking more than direct damages.

The Court concludes that Section 5(b) precludes the recovery Schnuck seeks in its negligence claim. As a result, XPO's motion to dismiss Schnuck's claim for negligence will be granted in part to the extent it seeks damages barred by Section 5(b). See <u>Union Elec.</u>, 2015 WL 1262941, at *7 (motion for partial judgment on the pleadings granted and negligence claim barred to the extent it sought consequential or indirect damages); <u>Sports Capital</u>, 2014 WL 1400159, at *8 (entering order limiting the amount of potential recovery and dismissing other damages "expressly barred by the parties' contract").

### b. Fraud (Count IV)

Schnuck asserts a claim for fraud based on five representations XPO made to Schnuck personnel in September, October, and November of 2014, which, Schnuck alleges, induced it to enter into the Agreement with XPO:

(i)     XPO possessed the skills, resources, experience and capabilities to successfully operate the warehousing and distribution business at the Facility;

(ii)    XPO had an organized team in place and experienced corporate support staff;

(iii)   If selected to operate the Facility, XPO would commit the effort and resources necessary to successfully operate the Facility;

(iv)   XPO had an experienced labor force and had and would execute a detailed transition plan; and

(v)    XPO had an experienced, dedicated project management team and had and would execute a detailed project plan.

(FAC at ¶¶ 86-90.) Schnuck further alleges these representations were false in that XPO was not capable of operating an integrated ambient and temperature controlled grocery distribution

center; did not have an organized team in place or experienced corporate support staff; did not prepare and execute transition and project plans; and did not commit the effort and resources necessary to successfully operate the Facility (FAC at ¶¶ 91, 92), and material in that Schnuck would not have agreed to enter the Agreement without those representations (FAC at ¶ 94).

In response, XPO argues that because the alleged misrepresentations concern the same subject matter as the Agreement, and its ability and intent to perform thereunder, Schnuck's fraud claim is barred by the economic loss doctrine. (Doc. No. 38 at 9-10.) XPO further argues that its statements concerning the experience or other qualifications of its staff, employees or management team were mere expressions of opinion or "puffing" which are not actionable representations (id. at 13-15), and that Schnuck fails to plead its claim with the specificity required under Fed. R. Civ. P. 9 (id. at 11-13).

Missouri courts have not yet addressed the application of the economic loss doctrine to fraud claims. Trademark Med., 22 F. Supp. 3d at 1002–03. Still, in certain circumstances the Eighth Circuit has held that a claim for fraud may be brought alongside a contractual claim, so long as it is "based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc., 69 F. Supp. 3d 928, 932–33 (E.D. Mo. 2014) (quoting AKA Distrib. Co. v. Whirlpool Corp., 137 F.3d 1083, 1086 (8th Cir. 1998) (collecting cases)). There are two critical factors in examining whether a fraud claim is independent of a contract claim under the economic loss doctrine. The first is whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract. Id. at 933. The second is whether the plaintiff

suffered additional damages outside the contract because of the alleged fraud.[4] Id. (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).

Dismissal is not warranted on the basis of the economic loss doctrine merely because the subject matter of the misrepresentation is referenced in the parties' contract. Superior Edge, Inc. v. Monsanto Co., 44 F. Supp.3d 890, 904 (D. Minn. 2014) (applying Missouri law). Indeed, many fraudulent inducement claims are based upon misrepresentations that are in some way referenced in the subject matter of the contract since the misrepresentations must be material to the contract. Id. Instead, "most courts have focused more precisely on whether a contract term conflicts with or contains the alleged misrepresentation, in which case the inducement claim is barred. Where a contract term contains or conflicts with an alleged misrepresentation, the contract term controls, and there is no fraudulent misrepresentation claim. Id.

Courts have "almost uniformly" found claims based on misrepresentations about a party's ***intent*** to perform its obligations under a contract to be barred by the economic loss doctrine, "as the terms of a party's performance are contained in the contract and misrepresentations about an intent to perform that manifest in a failure to perform can be remedied through a breach of contract action." Id. On the other hand, claims based on misrepresentations going to one party's ***ability*** to perform under a contract, so long as not actual contractual terms, have been found not to implicate the economic loss doctrine. Robinson Mech. Contractors Inc. v. PTC Grp. Holdings Corp., No. 1:15-CV-77-SNLJ, 2017 WL 3970602, at *4 (E.D. Mo. Sept. 8, 2017) (citing Web Innovations, 69 F. Supp. 3d at 933-34; Superior Edge, 44 F. Supp. 3d at 905). This is because in the absence of truthful information, the plaintiff would not have been able to specify certain terms in the Agreement to protect itself from commercial risk.

---

[4] There is no requirement that both elements be established in order to state a claim for inducement. See Superior Edge, Inc. v. Monsanto Co., 44 F. Supp.3d 890, 904 (D. Minn. 2014) (applying Missouri law).

Superior Edge, 44 F. Supp. 3d at 907 (citing MeterLogic, Inc. v. Copier Solutions, Inc., 126 F. Supp. 2d 1346, 1362 (S.D. Fla. 2000)).

In Web Innovations, the defendant was alleged to have misrepresented the number of its business partners and past donation rates. The court found these representations went to the defendant's ability to provide the required number of trailers of electronics on a consistent basis, but since the contract never explicitly required it to maintain any number of business partners, "it [could not] be said that the parties' negotiations fairly accounted for the misrepresentation," and the claim based on the misrepresentation was not barred by the economic loss doctrine. 69 F. Supp. 3d at 934. In Superior Edge, 44 F. Supp. 3d at 905, misrepresentations concerning a party's capabilities, personnel, infrastructure, and experience in the field, were found to relate to the inducement of the contract and not the performance of its terms. By comparison, in Compass Bank v. Eager Rd. Assocs., LLC, 922 F. Supp.2d 818 (E.D. Mo. 2013), a case relied upon by XPO, the parties' contract included two conditions precedent - a $4.15 million "Developer Settlement Payment" and a "Developer Letter of Credit" for $1.35 million. Plaintiff alleged defendants misrepresented that they had $4.15 million in cash and could obtain a letter of credit for $1.35 million. Because those "misrepresentations" "correspond[ed] precisely with the terms of the contract" alleged to have been breached, the court dismissed the fraudulent inducement claim under the economic loss doctrine. Id.

Accepting the facts in Schnuck's counterclaim as true and drawing all inferences in its favor, the Court finds Schnuck has stated a plausible claim for fraudulent inducement, and XPO's motion to dismiss the claim as barred by the economic loss doctrine will be denied.[5]

---

[5] As noted in Superior Edge, the court need not parse each of Schnucks' allegations to determine precisely which alleged misrepresentations state a claim and which do not. It is sufficient at this stage to determine that some aspects of Schnucks' fraudulent inducement allegations state a plausible claim for relief and are therefore sufficient to survive a motion to dismiss. Superior Edge, 44 F. Supp.3d at 908.

As for the sufficiency of XPO's representations, the Court declines to dismiss Schnuck's fraud claim based on particular representations that may constitute opinions or "puffing." See Midwest Printing, Inc. v. AM Int'l Inc., 108 F.3d 168, 170–71 (8th Cir. 1997) (mere expressions of opinion or "puffing" are not actionable representations); Love v. Career Educ. Corp., No. 4:11-CV–1585-JAR, 2012 WL 1684572, at *34 (E.D. Mo. May 15, 2012) (granting motion to dismiss because statements of opinion about quality of program were puffery); Trotter's Corp. v. Ringleader Restaurants, Inc., 929 S.W.2d 935, 940 (Mo. Ct. App.1996) ("Mere statements of opinion, expectations, and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation."). While it is certainly possible that some of XPO's representations may ultimately not be actionable, this does not warrant dismissal when the determination of whether the statements constitute actionable fraud depends on context and other facts to be identified in discovery. Superior Edge, Inc. v. Monsanto Co., 44 F. Supp. 3d at 909.

Alternatively, XPO argues Count IV should be dismissed for failing to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. (Doc. No. 38 at 11-13.) In order to state a claim for fraudulent misrepresentation, a complaint must identify the who, what, where, when, and how of the alleged fraud. It must "specify[ ] the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC, 781 F.3d 1003, 1013 (8th Cir. 2015) (quoting U.S. ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 821–22 (8th Cir. 2009)). Schnuck responds that its counterclaim is sufficiently pled and that XPO is essentially demanding it plead facts that XPO already knows. (Doc. No. 45 at 11.) Schnuck seeks

leave to amend its pleading to add additional facts or allegations should the Court find its counterclaim insufficiently pleads the fraudulent misrepresentation claim.

Having examined the pleading requirements for fraud together with the elements of a claim for fraudulent misrepresentation, the Court finds Schnuck has failed to plead the required elements with sufficient particularity. Schnuck does not set forth specific facts concerning the time, place or content of the false representations, or the identity of the person(s) making them. See Owen, 2011 WL 5330412, at *3. The Court will, therefore, grant XPO's motion but will dismiss Count IV without prejudice and give Schnuck twenty (20) days to amend its counterclaim to comply with the Federal Rules of Civil Procedure.

### c. Conversion – Count V

In Count V, Schnuck alleges that XPO converted its property by mishandling, misplacing and damaging temperature- and date-sensitive items at the Facility despite having been provided with information outlining XPO's authorized use and handling of the property. (FAC at ¶¶ 103-04.) XPO contends that Schnuck's conversion claim is barred by the economic loss doctrine because it is based on the subject matter of the Agreement and dependent on whether XPO adhered to the standards and duties set out in the Agreement. In support of its argument, XPO cites, *inter alia*, Vogt v. State Farm Life Insurance Co., No. 2:16-CV-04170-NKL, 2017 WL 471574 (W.D. Mo. Feb. 3, 2017), where a conversion claim was dismissed as barred by the economic loss doctrine. (Doc. No. 38 at 10-11.) On reconsideration, however, the court in Vogt vacated its dismissal, holding that "[a]lthough [plaintiff's] conversion claim may be tied up in and implicated by the court's interpretation of the policy language, the duty to not convert another's property exists independently of the parties' contractual obligations, and therefore,

both [breach of contract and conversion] claims may proceed." <u>Vogt v. State Farm Life Ins. Co.</u>,

No. 2:16-CV-04170-NKL, 2017 WL 1498073, at *2 (W.D. Mo. Apr. 26, 2017).

> The court in <u>Vogt</u> explained that:

> Missouri's economic loss doctrine … was derived from negligence and strict-liability cases and was created to preserve the distinction between tort claims sounding in warranty. The Missouri Supreme Court adopted the doctrine to preserve the distinction between tort and contract where a claim is based on the "loss of [the] bargain.

> To be sure, Missouri courts have never recognized a mere breach of contract as providing a basis for tort liability. This is because the act, not the breach gives rise to tort liability. Therefore, if the act done independently of the contract would result in a tort, and is not dependent on the elements of the contract claim, a tort claim may be asserted alongside a claim for breach of contract. Accordingly, Missouri law is clear that a single act can constitute both a breach of contract and a tort without the tort being barred by the economic loss doctrine.

<u>Id</u>. at *2 (internal quotation marks and citations omitted). The court acknowledged that while

"courts have indeed at times overstated the scope of the economic loss doctrine by stating it as an

absolute rule (and therefore without exceptions) or by referring to tort claims generally (instead

of to negligence and strict liability claims), … Missouri courts have never extended the

economic loss doctrine beyond the doctrine's traditional moorings as policing the boundaries

between warranty and negligence/strict liability to a claim for conversion." <u>Id</u>. at *3. Because the

economic loss doctrine does not bar Schnuck's conversion claim, and because the claim depends

on facts to be developed through discovery, XPO's motion to dismiss Count V will be denied.

## B. XPO's motion for judgment on the pleadings – Counts I and II of Counterclaim

In deciding a motion for judgment on the pleadings, the Court "accept[s] all facts pled by

the nonmoving party as true and draw[s] all reasonable inferences from the facts in favor of the

nonmovant." <u>Unite Here Local 74 v. Pinnacle Entertainment, Inc.</u>, 2011 WL65934, at *2-3 (E.D.

Mo. Jan. 10, 2011) (quoting <u>Waldron v. Boeing Co.</u>, 388 F.3d 591, 593 (8th Cir. 2004)); Fed. R.

Civ. P. 12(c). This is a strict standard, as "[j]udgment on the pleadings is not properly granted

unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Id. (quoting United States v. Any and All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)). As summarized in Federal Practice and Procedure:

> [A] Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice.

Id., at *3 (quoting 5C Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1367 (3d ed. 2010)). "In considering a Rule 12(c) motion, the Court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." Nationwide Mut. Ins. Co. v. Harris Medical Associates, LLC, 973 F. Supp.2d 1045, 1051 (E.D. Mo. 2013). Here, the Agreement was filed under seal with the Complaint and is therefore properly before the Court.[6]

In Counts I and II of its amended counterclaim, Schnuck alleges XPO breached its express or implied contractual duties, causing it more than $12M in damages, including "lost profits, lost sales, lost productivity, lost inventory, increased labor expenses, increased or additional clean-up expenses, equipment rental expenses, loss of backhaul revenue, increased acquisition costs, increased transportation expenses, increases in workers' compensation claims and expenses, increases in severance owed, excessive Warehousing Fees, and damages to [Schnuck's] (and Schnuck's-branded grocery stores') reputation and goodwill." (FAC at ¶¶ 1, 62.) XPO moves for judgment on Counts I and II limiting Schnuck to direct damages (i.e.,

---

[6] The Agreement was filed under seal because it contained confidential information that the parties contractually agreed to keep confidential. (See Doc. Nos. 4, 5, 6.)

excessive Warehousing Fees) based on Section 5(b) of the Agreement. XPO contends that pursuant to Section 5(b), Schnuck expressly and unambiguously agreed to limit its recovery for any damages arising out of XPO's management of the Facility in two ways. First, the parties agreed that "unless otherwise prohibited by law, neither party shall be liable for incidental or consequential damages or indirect, special or punitive damages." Second, Schnuck agreed that, even if it could recover for such damages notwithstanding this express waiver, its recovery would be limited to the lesser of (a) its self-insured retention ("SIR") under any applicable insurance policy or (b) $500,000. (Doc. No. 40 at 2.)

Schnuck opposes XPO's motion on three grounds. First, Section 5(b)'s purported limitation on its ability to recover incidental and other indirect damages does not apply to damages resulting from XPO's alleged breach of its first-party indemnification obligations.[7] According to Schnuck, the prefatory language to the limitation of liability provision ("[e]xcept for their respective indemnification obligations hereunder") cannot be interpreted any other way. (Doc. No. 46 at 2-4.) Second, application of Section 5(b)'s limitation of liability would violate Missouri public policy given XPO's alleged gross negligence and willful misconduct. (Id. at 4-7.) Third, there is a "latent ambiguity" in Section 5(b) which precludes judgment on the pleadings because it "presupposes" that any damages would be covered by insurance. Because Schnuck has no applicable insurance, it contends that the $500,000 self-insured damages cap does not apply. (Id. at 8-9.)

In reply, XPO argues that adopting Schnuck's interpretation of Section 5(b) would render the limitation of liability meaningless, in contravention of principles of contract interpretation. If,

---

[7] Schnuck alleges that "XPO has failed and refused to indemnify [Schnuck] from and against all claims, liabilities, losses, damages and expenses (including reasonable attorneys' fees and expenses) incurred or suffered as a result of or in connection with XPO's breach or breaches of the Agreement or XPO's negligence or willful misconduct." (FAC at ¶ 64.)

as Schnuck contends, Section 5(b) exempts not only third party claims, but also its direct claims against XPO, then the limitation of liability does not apply to any claim Schnuck might assert against XPO and is thus rendered a nullity. (Doc. No. 51 at 2-3.) Schnuck's interpretation also fails because it ignores the clause immediately following the prefatory exception clause – "[e]xcept for their respective indemnification obligations hereunder, *as limited herein* …" XPO maintains that the inclusion of "as limited herein" is a clear expression of the parties' intent that indemnification obligations (whether or not this refers to direct claims as well as third party claims) would be circumscribed by the damage limitations that followed. (Doc. No. 51 at 3.) The "as limited herein" language is referring to the remainder of the sentence, which prohibits the parties from recovering incidental or consequential damages or indirect, special or punitive damages. The next sentence of Section 5(b) begins with "Notwithstanding the foregoing limitations on types of damages" and ends by limiting XPO's exposure to the lesser of $500,000 or Schnuck's SIR. According to XPO, this reference to "the foregoing limitations" emphasizes that its liability is limited "notwithstanding" any exception that might have been carved out in the prior sentence (including the purported exception for "indemnification obligations" that Schnuck relies on). (Id. at 3-4.) Finally, even if Schnuck's interpretation is correct, and its recovery of the enumerated categories of damages is not completely barred, it is capped at $500,000, regardless of whether it could be considered an "indemnification" claim. (Id. at 4.)

Citing In re NHB, 287 B.R. 475 (Bankr. E.D. Mo. 2002), XPO also asserts that the limitation of liability is not contrary to public policy, because Missouri law does allow sophisticated businesses to enter contracts with each other which, short of complete exoneration, limits the liability for gross negligence or a willful injury which arises out of the performance of the contract. Id. at 477 (citing Alack v. Vic Tanny Int'l of Missouri, Inc., 923 S.W.2d 330, 337

(Mo. 1996); Liberty Financial Management Corp. v. Beneficial Data Processing Corp., 670 S.W.2d 40, 48 (Mo. Ct. App. 1984)). (Doc. No. 51 at 7-9.)

Lastly, XPO replies there are no issues of fact precluding entry of judgment on Counts I and II. Section 5(b) does not "presuppose" insurance coverage; rather, it requires that any insurance limits first be exhausted. If there is no "applicable insurance policy," then damages would be capped at $500,000. (Id. at 10-11.)

The Court subsequently granted the parties leave to more specifically address the issue of "first-party indemnification obligations." (See Doc. Nos. 56, 61.) In its sur-reply, Schnuck contends that by drafting the first sentence of Section 5(b) with reference to XPO's breaches of contract, negligence, and willful misconduct, and without reference to third-party claims, the parties created broad, reciprocal indemnification obligations. It is only in this context, in the same paragraph, that the parties reference—for the first time—limitations on damages. In the fourth sentence, the parties agree that "[e]xcept for their respective indemnification obligations," they cannot recover certain categories of damages from one another. Schnuck maintains that if the parties' indemnification obligations apply, then the limitation of liability does not. (Doc. No. 56 at 4.)

In its sur-rebuttal, XPO urges the Court to enforce the Agreement's unambiguous language, noting that Schnuck cannot reconcile its interpretation of Section 5(b) with the Agreement's other provisions evidencing the parties' intent to limit XPO's liability to direct damages, including for first party claims. (Doc. No. 57 at 3.) XPO further argues that the indemnification clause and the limitation of liability cannot, as Schnuck contends, be mutually exclusive. If the limitation of liability does not apply to *any* indemnification obligations (whether direct claims or third party claims), then *every* possible claim is exempt from the limitation,

meaning that the limitation of liability does not apply to any claim. (Id. at 5-8.) Lastly, the Court need not resolve the scope of the parties' indemnification obligations because "in the event that XPO would otherwise be liable to Schnuck for consequential, indirect, special or punitive damages," the SIR applies to cap damages at $500,000. (Id. at 4-5.)

In order to determine if XPO is entitled to judgment as a matter of law, this Court must examine Missouri law regarding indemnification agreements and contract interpretation. "The rules applicable to the construction of contracts apply generally to indemnity agreements." Express Scripts, Inc. v. Maury Cty., No. 4:09-CV-00585-ERW, 2010 WL 1141342, at *3 (E.D. Mo. Mar. 22, 2010) (citations omitted). Again, the cardinal rule of contract interpretation is to ascertain the parties' intention and give effect to that intention. Schnuck Markets, 86 F. Supp. 3d at 1064. "The intent of the parties is to be determined based upon the contract alone and not based on extrinsic or parol evidence unless the contract is ambiguous." Express Scripts, 2010 WL 1141342, at *3. "A provision is not ambiguous merely because the parties disagree over its meaning." Id. Although the parties make different arguments as to the meaning of Section 5(b), upon careful review of the Agreement as a whole, the Court finds that Section 5(b) was intended to limit the parties' respective liability to direct damages, including for first party claims, and that it is not necessary to rely on extrinsic or parole evidence.

Indemnity generally refers to third-party claims. Praetorian Ins. Co. v. Site Inspection, LLC, 604 F.3d 509, 516 (8th Cir. 2010). Although an indemnity provision may encompass direct breach of contract claims, this depends on the parties' intent as expressed in the contract. See Zalkind v. Ceradyne, Inc., 194 Cal. App. 4th 1010, 1023-25 (2011). Here, other provisions of the Agreement support the conclusion that the parties intended to limit their exposure, particularly that of XPO, to direct damages, including for first party claims. In particular, Section 5(a)(i)

states that "[w]here XPO is otherwise liable under this Agreement for loss of, or damage to inventory, said liability shall be limited to the actual cost of the inventory lost or damaged based on the replacement cost for said inventory." Section 6(h), which sets forth inventory claim procedures, also states that XPO is only liable for the "replacement cost" of inventory, even when such losses are due to XPO's "negligence or willful misconduct." As discussed above, it would be unreasonable to interpret Section 5(b) to allow Schnuck to recover consequential or indirect, special or punitive damages for XPO's alleged negligence (i.e., mishandling of inventory) when other provisions of the Agreement clearly limit it to direct damages in the form of replacement costs.

Further, the limitation of liability provision clearly sets forth the parties' intent that indemnification obligations (whether direct claims or third party claims) would be circumscribed by the damage limitations that followed. The phrase "as limited herein," which follows the language "[e]xcept for their respective indemnification obligations hereunder," refers to the remainder of the sentence, which prohibits the parties from recovering incidental or consequential damages or indirect, special or punitive damages. The next sentence of Section 5(b) begins with "[n]otwithstanding the foregoing limitations on types of damages" and ends by limiting XPO's exposure to the enumerated categories of damages to the lesser of $500,000 or Schnuck's SIR ("SIR Damages" provision). This reference to "the foregoing limitations" emphasizes that XPO's liability is limited "notwithstanding" any exception that might have been carved out in the prior sentence (including the purported exception for "indemnification obligations" that Schnuck relies on).

In any event, the precise scope of the parties' indemnification obligations need not be resolved because the "SIR Damages" provision does not reference and is in no way contingent

upon whether the indemnification obligations run to first party claims, third party claims, or both. Should XPO be "otherwise liable" to Schnuck for consequential or punitive damages, the parties again expressed their clear intent that such liability be limited to the "lesser of" the SIR or $500,000, regardless of whether it could be considered an indemnification claim. There is no support for Schnuck's contention that, absent applicable insurance, there is no cap and XPO's liability is unlimited.

If the Court were to adopt Schnuck's interpretation that both third party claims and direct claims are exempt from the limitation of liability, then the limitation of liability has no application to any claim Schnuck might assert against XPO and thus no meaning within the context of the Agreement.[8] The Court rejects such an interpretation. The parties are sophisticated businesses who clearly had a purpose for including the limitation of liability exception in the Agreement. An "interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Schnuck Markets, 86 F. Supp. 3d at 1065 (citations omitted). The Court will, therefore, grant XPO's motion for judgment on the pleadings in part and limit Schnuck's damages under Counts I and II of its First Amended Counterclaim to direct damages as set forth in Section 5(b) of the Agreement.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Schnuck Markets, Inc.'s Motion to Dismiss Counts IV and V of Plaintiff's Complaint [24] is **GRANTED** and Counts IV and V of Plaintiff's Complaint are **DISMISSED** without prejudice.

---

[8] As noted by XPO, Schnuck has not identified a claim that would fall outside the parties' "broad" indemnification obligations, but within the limitation of liability, so as to give the latter some effect.

**IT IS FURTHER ORDERED** that Plaintiff/Counterclaim Defendant Jacobson Warehouse Co., Inc., d/b/a/ XPO Logistics Supply Chain's Motion to Dismiss Counts III, IV, and V of Defendant/Counterclaim Plaintiff's Counterclaim [37] is **GRANTED in part** as follows:

Count III is **DISMISSED in part** to the extent it seeks to recover damages other than direct damages as set forth in Section 5(b) of the Agreement.

Count IV is **DISMISSED** with leave to amend within twenty (20) days of the date of this Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Judgment on the Pleadings – Counts I and II of Counterclaim [39] is **GRANTED in part** in accordance with the ruling herein.


Dated this 29th day of November, 2017.

_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**