**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JACOBSON WAREHOUSE COMPANY, INC., d/b/a XPO LOGISTICS SUPPLY CHAIN, | ) ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) ) | No. 4:17-CV-00764 JAR |
| SCHNUCK MARKETS, INC., | ) ) | |
| Defendant/Counterclaim Plaintiff. | ) ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the following motions: Schnuck's Motion for Summary Judgment on its Breach of Contract Claims for True-Up Damages (Doc. No. 154); Schnuck's Motion for Partial Summary Judgment on XPO's Claims for Breach of Contract and Action on Account (Doc. No. 161); Motion for Partial Summary Judgment on XPO's Claim for Union Avoidance Costs and Schnuck's Affirmative Defense of Offset (Doc. No. 164); and XPO's Motion for Partial Summary Judgment as to Counts I Through V of Second Amended Counterclaim and Count I of XPO's Complaint (Doc. No. 173). The motions have been extensively briefed and are ready for disposition.

### I.     Background

The background of this case is set out in detail in the Court's November 29, 2017 Order and incorporated by reference herein. (See Doc. No. 64). Briefly, in May 2015, XPO and Schnuck (also referred to herein as "SMI") entered into an Amended and Restated Operating Agreement (the "Agreement") setting forth the terms and conditions under which XPO would

provide Schnuck with certain warehouse management services for its new distribution facility known as NorthPark. Each side contends the other breached their contractual and other obligations under the Agreement. XPO asserts claims against Schnuck for breach of contract (Count I); declaratory judgment (Count II); and action on account (Count III).[1] (Complaint ("Compl."), Doc. No. 1). Schnuck counterclaims for breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); negligence (Count III); fraud (Count IV); conversion (Count V); and breach of contract – transition services agreement (Count VI). (Second Amended Counterclaim ("SAC"), Doc. No. 69). In previous rulings, the Court has limited Schnuck's recovery for damages under Counts I - V of its counterclaim to direct damages as set forth in a limitation of liability provision in Section 5(b) of the Agreement. (Doc. Nos. 64, 116).

## II.    Legal standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

---

[1] On Schnuck's motion, the Court dismissed XPO's claims for quantum meruit (Count IV) and unjust enrichment (Count V). (Doc. No. 64).

**III.     Discussion**

The parties' dispute is primarily focused on the interpretation and application of certain key provisions of the Agreement, which will be addressed with the parties' respective motions. This Court has previously found the Agreement to be an unambiguous contract between sophisticated parties and notes that the goal of contract interpretation is to give effect to the parties' intent as evidenced by the language of the agreement.

**A.  Schnuck's Motion for Summary Judgment for True-Up Damages**

Schnuck seeks summary judgment on its breach of contract counterclaim regarding XPO's "true-up" obligations under the Agreement. Schnuck contends that XPO was required to reconcile, or "true-up," its actual operating expenses at NorthPark with the parties' budget, on a monthly basis, based on "cost-per-case."

Pursuant to Section 4(a)(i)[A] of the Agreement, "[t]he operating budget shall be prepared by XPO for Schnucks' approval each year during the term in advance of the commencement of Schnucks' fiscal year, which commences on or about October 1st and ends on or about September 30th … Once the budget is set for the upcoming year, Schnucks agrees to pay XPO the Warehousing Fee on a weekly basis."

Under Section 4(a)(i)[C], each budget presented by XPO "shall have cost-per-case that XPO shall meet each accounting period." The cost-per-case "shall be calculated by dividing the sum of the period's fixed and variable operating costs … by the cases shipped during that period." If, in any month, XPO came in under the budgeted cost-per-case, Schnuck agreed to pay XPO 50% of that amount as a reward for operating efficiently. If XPO exceeded the established cost-per-case in a given month, then it agreed to repay Schnuck 50% of the overage as a penalty

the next month. Under the Agreement, "[a]ny penalty deductions or rewards shall be accounted for in the Period True Up process pursuant to Section 4(a)(1)(D)[.]"

Section 4(a)(1)[D] provides that, "[u]pon completion of each Schnuck accounting period, a review will take place to 'true up' to the actual costs for the period. The true up shall consist of a review of the actual period costs to operate the Facility compared to the amount paid via the weekly invoices for the month, including the resulting Management Fee." Invoice adjustments to account for true-ups were to be made "in the next weekly invoice after the true-up process."

It is undisputed that XPO did not conduct any true-ups for NorthPark. As a result, in January 2017, Schnuck withheld approximately $1.7 million from XPO invoices to account for amounts it contends XPO owed it under the Agreement's true-up provision. In addition, Schnuck claims entitlement to another $248,289 in "clawback" damages for amounts due in true-up penalties for period 5 in FY 2017.[2]

XPO responds that Schnuck is not entitled to summary judgment on its claim for "true up" damages because an approved budget was required before any true-ups could occur, and Schnuck admittedly never approved any of XPO's proposed budgets. (See SMI True-Up SOF ¶ 28). Schnuck does not dispute it was obligated under the Agreement to approve a budget or that the true-up was dependent upon having an approved budget. Rather, Schnuck argues that the undisputed facts demonstrate it "accepted" XPO's FY 17 budgets and satisfied any and all preconditions necessary to trigger XPO's true-up obligation.[3] Specifically, XPO circulated draft budgets in September 2016; Schnuck and XPO held in-person meetings about these budgets; Schnuck sought two corrections in late September 2016; and XPO sent budgets titled "NP FY

---

[2] XPO is seeking summary judgment on the $1.7M that it contends Schnuck wrongfully withheld from its invoices based on Schnuck's flawed true-up calculations. XPO's motion is addressed below.

[3] As noted by XPO, it is unclear why Schnuck uses the term "accept" rather than "approve," which is the term used in the parties' Agreement.

Budgets Final.092916.xlsx" to Schnuck a little before 5:00 p.m. on September 30, 2016, the day before the beginning of Schnuck's 2017 fiscal year.[4] Schnuck's corporate representative Steve Carroll testified that consistent with its past practice with XPO at other facilities (Park 370 and ColdStor) regarding budgets, Schnuck had never formally "approved" a budget. Schnuck contends that these facts, together with the undisputed fact that XPO submitted invoices to Schnuck and Schnuck paid them, demonstrate that Schnuck had accepted XPO's budget.

XPO further argues that even if a budget had been approved, Schnuck's true-up calculation does not deduct certain labor costs as required by the Agreement, namely, costs associated with XPO employees who have not completed a 90-day training period.[5] According to XPO, when these costs are deducted from Schnuck's calculation, XPO would owe nothing under the true-up for the damages period. Schnuck replies that XPO has waived application of the 90-day labor provision by failing to conduct true-ups or alternatively, is estopped from relying on the 90-day labor provision by virtue of its breach of the covenant of good faith and fair dealing by hiring only temporary labor for NorthPark.

The Court finds there are disputed issues of material fact concerning the satisfaction of prerequisites for application of the true-up obligation, including whether Schnuck actually "approved" a budget for FY 2017. As for Schnuck's waiver and estoppel argument, while evidence that XPO hired an all-temporary workforce may be relevant and admissible on the issue of the application of the true-up provision, it does not establish waiver as a matter of law. Accordingly, Schnuck's motion for summary judgment for true-up damages will be denied.

---

[4] XPO notes there were multiple draft budgets for FY 17 called "final" in the subject line of the transmittal e-mail only to lead to further discussions and revisions. (Resp. to SMI True-Up SOF ¶ 25).

[5] Section 4(a)(i)[C] of the Agreement provides that when calculating the cost-per-case for any accounting period, "only the labor costs associated with XPO employees who have completed their ninety (90) day training period shall be included in the calculation."

**B. Schnuck's Motion for Partial Summary Judgment on XPO's Claims for Breach of Contract and Action on Account**

In Counts I and III of its Complaint, XPO alleges that Schnuck breached the Agreement by failing to pay certain of XPO's invoices. Schnucks admits it did not pay the disputed amounts, but contends it is entitled to summary judgment on XPO's claims for two reasons. First, any portion of the disputed amounts that pertains to "union avoidance" costs is barred as a matter of law.[6] Second, with respect to the remaining amounts, none of the invoices comply with XPO's obligation to invoice on a budgeted weekly basis. Moreover, XPO has not produced admissible evidence to support the amounts sought with sufficient particularity.

Section 4(a) of the Agreement required XPO to invoice on a budgeted weekly basis. "Upon completion of each Schnucks accounting period," XPO was required to prepare a true-up of weekly amounts invoiced to actual costs: (1) that XPO incurred to provide the warehousing services; and (2) for which XPO was entitled to be reimbursed under Schedule 2 to the Agreement. As discussed above, XPO did not perform true-ups in connection with its work at NorthPark. Instead, XPO submitted its invoices to Schnuck on a "cost-plus" basis. Schnuck asserts it did not agree to pay XPO's invoices on a cost-plus basis, nor was the Agreement amended to allow XPO to invoice Schnuck on a cost-plus basis. Thus, Schnuck argues, the invoices are defective and it has neither an obligation, nor the ability, to evaluate and pay them as submitted. Schnuck further argues that even if it had permitted XPO to invoice on a cost-plus basis, XPO has failed to show that the amounts on the invoices correspond to expenses incurred

---

[6] Schnuck has moved for summary judgment on XPO's claim for union avoidance costs and its affirmative defense of offset on the grounds that it never asked XPO to conduct union avoidance activities, and never agreed to pay costs associated with these activities. (Doc. No. 164). Schnuck's arguments pertaining to union avoidance costs are discussed below in connection with its separate motion.

for the operation of NorthPark during the period applicable to the Agreement; that XPO was authorized under the Agreement to incur the expense; that the vendor actually did the work; that the vendor invoiced XPO for the work; that XPO paid the vendor invoice; and that XPO is entitled to reimbursement on the amounts invoiced. Schnuck urges the Court to grant summary judgment because the evidence is insufficient for XPO to survive a directed verdict at trial. See Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 250 (because the standard for granting summary judgment mirrors the standard for a directed verdict, summary judgment is appropriate if the moving party establishes there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party).

XPO responds that because there was no approved budget, it could not invoice based on a weekly budgeted amount and thus invoiced Schnuck based on a "cost-plus" model. In addition, XPO maintains that it has provided sufficient evidence to support its damages claims as to its invoices, and asserts that each invoice for NorthPark included an itemized summary page of all expenses, including third party expenses, as well as a page listing all third-party invoices applied to that invoice. XPO contends that copies of those third-party invoices were available upon request by Schnuck and that it did produce third party invoices for the NorthPark invoices at issue. XPO further responds that with the exception of a request from Alex Dye to Shannon Christensen on July 11, 2017 requesting "support (invoices)" for six invoices sent on June 30, 2017, which XPO provided on July 17, 2017, Schnuck has not identified any other instance where it requested third-party invoices or whether it had any outstanding requests for backup. XPO also contends that between August 18, 2016, and June 16, 2017, Schnuck paid at least $23,310,898.57 of XPO's invoices without asking to see third-party invoices or any other backup - a fact among many disputed by Schnuck. (See Resp. to XPO's Supp. Invoice SOF at ¶ S1).

While denying the lack of supporting documentation for its invoices, XPO further argues that at the very least there is a dispute of fact as to the backup that precludes summary judgment in Schnuck's favor.

The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party. Schnuck has not established that there is no genuine dispute about the facts supporting each element of the causes of action upon which XPO will have the burden of proof at trial, including, *inter alia*, the reasonableness of the charges. <u>See</u>, <u>e.g.</u>, <u>Home Serv. Oil Co. v. Cecil</u>, 513 S.W.3d 416, 419–20 (Mo. Ct. App. 2017). Furthermore, XPO's position is that without an approved budget, it could not have invoiced pursuant to the Agreement. The Court has ruled that whether there was an operating budget is a disputed issue of material fact. In light of these material factual disputes, Schnuck is not entitled to judgment as a matter of law on XPO's claims for breach of contract and action on account as they relate to expenses other than union avoidance costs, discussed below.

### C. Schnuck's motion for partial summary judgment on XPO's claim for union avoidance costs and Schnuck's affirmative defense of offset

XPO hired Action Resources to persuade XPO employees not to unionize.[7] Action Resources submitted invoices to XPO for its union avoidance work, which it performed in February 2016, March 2016, April 2016, May 2016, June 2016,[8] and November 2016. XPO ultimately paid Action Resources $650,000 for its union-avoidance services.

---

[7] The parties dispute whether the primary purpose of the union persuaders was related exclusively to NorthPark. (Resp. SMI Union Avoidance SOF at ¶ 1).

[8] Schnuck argues that fees predating July 2016, when XPO began operating NorthPark, necessarily relates to anti-union campaigns XPO waged at other facilities in St. Louis and thus are not a cost or expense associated with operating NorthPark. XPO responds that all of the union persuader expenses benefitted NorthPark even if some of the activities took place at Park 370.

On February 18, 2017, XPO invoiced SMI for union avoidance costs in the amount of $160,000 and identified those costs as falling within a cost category titled "Miscellaneous G&A." SMI paid these charges under protest, and reserved its right to recoup them in litigation. On May 31, 2017, XPO invoiced SMI for union avoidance charges in the amount of $490,154.20. Like the February invoices, the May 31, 2017 invoices included these charges within a cost category titled "Miscellaneous G&A." SMI refused to pay these charges.

XPO is seeking to recover $490,154.20 in Union Avoidance costs through its breach of contract and action on account claims. Schnuck argues it is entitled to summary judgment on XPO's claim for union avoidance costs because it never asked XPO to conduct union avoidance activities, and never agreed to pay costs associated with these activities. Schnuck further argues that because XPO wrongfully invoiced Schnuck for union avoidance costs, Schnuck is entitled to credit the amounts it paid under protest, or offset them against any damages to which XPO would otherwise be entitled.

XPO admits that Schnuck did not affirmatively ask it to use union persuaders, but asserts that one of the primary reasons Schnuck hired XPO to manage NorthPark was because it operated on a non-union basis, had a track record of being "proactive" in keeping union activity out of its facilities, and because Schnuck wanted a non-union workforce at NorthPark. XPO argues that Schnuck is obligated to pay the Union Avoidance expenses under the Agreement because Schnuck was fully aware that XPO was incurring these expenses on Schnuck's behalf for the benefit of NorthPark. (XPO Resp. to SMI Union Avoidance SOF at ¶ 35).

Schnuck's payment obligations are expressly set out in Section 4(a) of the Agreement, wherein Schnuck agreed to pay XPO a Warehousing Fee in exchange for managing operations at NorthPark. The Warehousing Fee is comprised of the sum of fixed and variable operating costs,

plus a seven percent (7%) management fee. Schedule 2 to the Agreement lists the categories of weekly fixed and variable costs for which Schnuck is responsible: (1) salaries, wages, and benefits, including warehouse wages, warehouse office wages, and payroll taxes; and (2) general and administrative expenses, including contract mechanic labor, insurance expenses, advertising and recruiting, and safety expense. Despite XPO's contention that union avoidance costs were a variable cost "of the Facility" pursuant to Section 4(a)(i), such costs are not specifically identified on Schedule 2, nor are they fairly and reasonably encompassed within the categories of costs for which Schnuck agreed to be liable under the parties' Agreement.

It is undisputed by the parties that union avoidance was a goal for NorthPark and one of the reasons Schnuck hired XPO. Nevertheless, XPO cannot pass off to Schnuck the cost of providing what it was offering to Schnuck, namely a non-union workforce. Accordingly, Schnuck's motion will be granted on XPO's claim for union avoidance costs and Schnuck's affirmative defense of offset.

### D. XPO's Motion for Partial Summary Judgment

XPO moves for partial summary judgment on three grounds. First, regarding Schnuck's damages claims in Counts I-V of its counterclaim, XPO argues that with the exception of replacement cost of inventory loss, all of Schnuck's damages are consequential and thus barred by the limitation of liability provisions in the Agreement. Second, XPO contends that Schnuck cannot establish a prima facie case of either fraudulent inducement (Count IV) or conversion (Count V). Lastly, XPO argues it is entitled to judgment on its breach of contract claim for Schnuck's admitted refusal to pay amounts invoiced for services under the Agreement.

In response, Schnuck argues that the Court should deny XPO's motion because: (1) Schnuck's losses were "direct, foreseeable, proximately caused and reasonably, understandably

and admissibly determined"[9]; (2) genuine issues of material fact must be submitted to the jury with regard to the intentional torts XPO committed; and (3) neither the law nor the facts support judgment for XPO on its breach of contract claim.

### (1) Schnuck's damage claims[10]

In its counterclaim, Schnuck seeks recovery for the replacement cost of damaged or lost inventory; lost profits; "out of pocket costs" for expenses related to the delayed closing of the Bridgeton warehouse; "lost store sales and other," which includes hotel, food and other expenses related to Schnuck's "crisis team"; and "clawback" damages consisting of funds Schnuck believes it is owed under the Agreement's "true-up" provision.

XPO argues that with the exception of replacement cost of inventory loss and clawback damages, all of Schnuck's claimed damages are indirect or consequential and thus barred under the Agreement, which this Court has found expressly and unambiguously limits the parties to recovering direct damages. See Section 5(b). More specifically, the Agreement limits Schnuck to the replacement cost of inventory loss caused by XPO's negligence or willful misconduct. See Section 5(a)(i) ("[w]here XPO is otherwise liable under this Agreement for loss of, or damage to inventory, said liability shall be limited to the actual cost of the inventory lost or damaged based on the replacement cost for said inventory."); Section 6(c) ("[s]ubject to the Allowance (as defined in section 6(i)), XPO shall be responsible, at its sole cost and expense, for all inventory losses due to pilferage or damage caused by the negligence or willful misconduct of XPO or its employees"); see also Section 6(h). XPO further argues it is not liable for even the replacement

---

[9] Motions have been filed challenging the reports and testimony of the parties' respective damages experts, retained and non-retained. Those motions will be addressed in a separate order.

[10] Schnuck's total damage claim is $9,791,554. (SMI Resp. to XPO SOF, Doc. No. 202 at ¶¶ 97-98).

cost of any inventory loss until such time as those losses exceed the one percent (1%) inventory loss "Allowance" set forth in Section 6(i) of the Agreement.

Schnuck responds that it bargained for XPO to provide all warehouse management and logistics services necessary to handle Schnuck's perishable and grocery items, on the schedule mutually agreed to, pursuant to prevailing industry standards. Citing Carolee, LLC v. eFashion Sols., LLC, No. 2:12CV02630, 2013 WL 5574594, at *7 (D. N.J. Oct. 9, 2013), Jay Jala, LLC v. DDG Constr., Inc., No. CV 15-3948, 2016 WL 6442074, at *2 (E.D. Pa. Nov. 1, 2016), and Luminara Worldwide LLC v. Liown Elecs. Co., No. 14CV03103, 2017 WL 1064887, at *3 (D. Minn. Feb. 27, 2017), Schnuck argues that its lost profits and the costs and expenses it incurred to secure XPO's performance under the Agreement are "benefit of the bargain" damages and thus constitute direct damages.

Under Missouri law, direct damages are "damages that [ ] flow directly and immediately from an act." Union Elec. Co. v. Chicago Bridge & Iron Co., No. 4:14CV31 RWS, 2015 WL 2193809, at *2 (E.D. Mo. May 11, 2015). In the context of a breach of contract, direct damages are those damages that are "the direct and natural consequences of the breach." Id. On the other hand, consequential damages are "those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement" or, put another way, are "necessarily one step removed" from the underlying contract. Union Elec. Co. v. Chicago Bridge & Iron Co., No. 4:14CV31 RWS, 2015 WL 1262941, at *5 (E.D. Mo. Mar. 19, 2015); Union Elec., 2015 WL 2193809, at *3. See also Jay Jala, 2016 WL 6442074, at *2 ("consequential damages refer to economic harm beyond the immediate scope of the contract.").

In <u>Union Elec.,</u> the issue for the court's determination was whether damages were recoverable under a limitation of liability provision that permitted recovery of direct damages, but precluded consequential damages. There, the parties - "two experienced and sophisticated entities with roughly equal bargaining positions" - entered into an agreement for nuclear maintenance services. 2015 WL 1262941, at *4. The limitation of liability clause in the agreement provided:

> B. Consequential Damages
>
> (ii) With respect to claims for breach of contract and each other's property damage, neither Party and their parents, affiliates and subsidiaries shall be responsible to the other for consequential, incidental, indirect, punitive or exemplary losses or damages, or any liability for loss of revenue, loss of profit, loss of product, loss of replacement power or business interruption, loss of business opportunity, howsoever caused, including negligence, gross negligence, and strict liability.

The plaintiff sought to recover for damages that occurred during the performance of maintenance services at its power plant. In addition to seeking payment for property damage caused to a transformer, plaintiff also sought damages for a two-delay in plant operations, offsite remediation, safety orientations, safety stand downs, as well as training and badging for new employees. The court found these damages were not directly and immediately caused by the arc flash incident which damaged the transformer, but rather damages resulting indirectly from the arc flash incident. <u>Id</u>. at *5. The court further found these are the kinds of consequential or indirect damages that parties to a nuclear services contract would contemplate at the time of the parties' agreement. <u>Id</u>. Thus, these damages were "consequential, incidental, indirect, punitive or exemplary losses or damages" and barred under the broad language of the parties' agreement and Missouri law. <u>Id</u>.

Like the delays and re-trainings resulting from the defective performance in <u>Union Electric</u>, Schnuck's non-inventory losses, i.e., "out of pocket" damages related to the delayed

closing of the Bridgeton warehouse, and "lost store sales and other" expenses incurred during its "crisis" response, are neither directly nor immediately caused by XPO's alleged breach or negligence. Rather, these damages relate to economic harm beyond the immediate scope of the Agreement. Jay Jala, 2016 WL 6442074, at *2.

As for the profits Schnuck would have realized at the store level, lost profits based on sales to third parties are typically regarded as consequential damages because they are "necessarily one step removed" from the underlying contract, Union Elec., 2015 WL 1262941, at *5; Union Elec., 2015 WL 2193809, at *3. See also Foam Supplies, Inc. v. Dow Chem. Co., No. 4:05CV1772 CDP, 2008 WL 3159598, at *1 (E.D. Mo. Aug. 4, 2008), where the court ruled on summary judgment that a claim for lost profits was barred by a limitation of liability clause excluding consequential damages. The court explained that "consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." Id. at *5.

Schnuck's cited authority is distinguishable in that Schnuck did not bargain for the damages it is seeking beyond replacement cost for inventory loss. In Luminara, the court found the contract at issue closely resembled a requirements contract in which a buyer agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the buyer's needs during the contract period. Thus, plaintiff had an expectancy that it would profit from any need defendant might have for plaintiff's products, such that when defendant began sourcing material from plaintiff's competitor, it denied plaintiff the benefit of its

bargain with defendant, i.e., lost profits from sales to defendant, not to a third party as is the case here. 2017 WL 1064887, at *5.

In Jay Jala, plaintiff contracted with defendant for the construction of a motel within a certain timeframe. When defendant left the job before completing the work, plaintiff terminated the contract and finished the project on its own. Defendant moved for partial summary judgment seeking to block recovery of certain categories of damages based on a contractual waiver of consequential damages. Notably, plaintiff withdrew its claim for lost profits or loss of income, effectively conceding that these damages were covered by the waiver. 2016 WL 6442074, at *3-7.

In determining whether the damages plaintiff suffered were direct or consequential, the court in Jay Jala instructed that "direct damages are the costs of a plaintiff getting what the defendant was supposed to give—the costs of replacing the defendant's performance. Other costs that the plaintiff may not have incurred if the defendant had not breached, but that are not part of what the plaintiff was supposed to get from the defendant, are consequential." 2016 WL 6442074, at *2. The court concluded that insurance costs, advertising expenses, and furniture and equipment lease costs were precluded consequential damages, but that expenses incurred in completing the project such as additional loan interest costs and utility bills were recoverable direct damages arising from the defendant's contractual obligation to complete the project on time. Id. at *3-7. In the instant case, the Agreement contains no time requirements for XPO's performance and does not reference Bridgeton or its closure. Thus, damages related to Schnuck's continued operation of Bridgeton cannot be said to arise from the immediate scope of the Agreement.

In Carolee, the parties entered into an e-commerce agreement under which the defendant maintained plaintiff's inventory, processed orders and payments and shipped products to customers in exchange for a percentage of the proceeds from internet sales and a $75,000 "project launch fee" related to the plaintiff's website. The agreement contained a limitation of damages provision prohibiting recovery of "indirect," "incidental" or "consequential" damages. Plaintiff subsequently filed a complaint alleging that defendant had breached the agreement and sought damages. The court determined that plaintiff could recover the launch fee as direct damages because plaintiff was merely recovering the value of the defendant's performance. 2013 WL 5574594, at *7.

Thus the Court concludes, under the clear and unambiguous language of the Agreement and consistent with Missouri law and other definitions of direct and consequential damages, that Schnuck's claims for lost profits, "lost store sales and other" damages, and "out of pocket" costs relating to the continued operation of the Bridgeton warehouse constitute consequential damages and are thus barred by the Agreement's limitation of liability provision. In this respect, XPO's motion for partial summary judgment will be granted.

As for Schnuck's damages claims for inventory loss and "clawback" amounts relating to the Agreement's "true-up" provision, the Court finds these claims raise a number of disputed factual issues concerning the appropriate methodology for calculating the amount of inventory loss, the application of any damages limitations, i.e., the Inventory Loss Allowance, and whether XPO has satisfied all conditions precedent of the Agreement.

XPO contends that Schnuck's calculation of inventory loss is inconsistent with the Inventory Claim Procedure set out in Section 6(h), which provides that XPO was only liable for actual inventory losses for which it was found to be at fault, either through its "negligence or

willful misconduct" determined after an investigation pursuant to procedures specified in the Agreement. XPO argues that Schnuck did not follow this process - relying instead upon a comparison of inventory loss at NorthPark to an average inventory loss experienced at Bridgeton, with no finding that XPO's negligence or willful misconduct was the cause of such loss.

Schnuck takes the position that none of its inventory losses are barred or limited based on the application of Section 6(h) because the inventory claims procedure only applies to a limited subset of inventory losses discovered through required "cycle counting."[11] Schnuck contends that XPO breached the Agreement by failing to conduct cycle counting, thereby waiving the right to assert Section 6(h) as a damages limitation. XPO disputes Schnuck's contention, noting that Schnuck's Manager of Accounts Payable, Jamie Ryberg, routinely sent inventory adjustment reports to both Schnuck and XPO based in part on cycle count adjustments and that Schnuck's own damages calculations distinguish between inventory adjustments made due to cycle counts and those made for other reasons.

With regard to the Inventory Loss Allowance, Section 6(i) entitles XPO to a loss allowance equal to one percent (1%) of the cases received and shipped annually by each department at NorthPark. For the first year, the Allowance is determined in conjunction with the operating budget for the year, based on the projected number of cases shipped and received. Thereafter, the Allowance is based on the actual number of cases shipped and received in the prior contract year. XPO asserts that for the period in which Schnuck is claiming lost inventory damages, the Allowance was 437,794 cases, a fact disputed by Schnuck. (SMI Resp. to XPO

---

[11] Cycle counting involves physically counting cases or items in assigned slots in the warehouse and comparing the physical count to the quantity listed in the inventory system known as Triceps. (SMI Add'l SOF at ¶ 184).

SOF at ¶ 137).[12] Schnuck admits its inventory loss calculation does not account for the Allowance but takes the position that none of its inventory loss is subject to the Allowance. Schnucks argues that when the Allowance applies, how it is applied, whether XPO satisfied its condition precedent, whether the provision was waived, and whether it applies to XPO's intentional misconduct are all disputed issues of fact that cannot be resolved on summary judgment. Based on the record evidence, the Court agrees.

In light of the disputed factual issues regarding, *inter alia*, the appropriate methodology for calculating inventory loss and the application of any damages limitations, the Court is unable to conclude that XPO is not liable for the replacement cost of Schnuck's inventory loss. Thus, XPO's motion for judgment in its favor will be denied as it relates to Schnuck's damages claims for inventory loss and "clawback" amounts.

### (2) Conversion/Fraudulent Inducement

### a. Conversion

Schnuck's claim for conversion alleges that "XPO made wrongful use of [Schnuck's] property by mishandling, misplacing, and damaging temperature- and date-sensitive items at the Facility." (SAC at ¶ 104). Schnuck further alleges that "XPO has failed and refused to reimburse it for inventory losses due to damage caused by XPO's negligence or willful misconduct, including XPO's negligent handling of Schnuck's inventory." (SAC at ¶ 63). XPO argues that Schnuck's claim fails because, as a matter of law, negligence cannot be the basis of a conversion claim and because Schnuck has no evidence that XPO intentionally lost, damaged, or destroyed any inventory. In response, Schnuck asserts that XPO misconstrues the intent requirement for a claim of conversion as requiring wrongful intent. The Court agrees.

---

[12] XPO's damages expert Angela Morelock calculated the Loss Allowance at 437,794 cases. (Morelock Report at 12). Schnuck argues that no facts can be established through her report and testimony and moves to exclude her opinions. Schnuck's motion will be addressed in a separate order.

To establish conversion, it is not essential to prove that "the defendant acted with wrongful motive or intent." Moore Equipment Co. v. Callen Const. Co., Inc., 299 S.W.3d 678, 682 (Mo. Ct. App. 2009) (quoting Hinton v. State Farm Mut. Auto. Ins. Co., 741 S.W.2d 696, 699–700 (Mo. Ct. App. 1987)). "Generally, questions of good faith, motive, knowledge or ignorance, or care or negligence are not involved in actions for conversion." Id. Instead, liability for conversion requires proof that the defendant acted with the intent to exercise control which deprived the plaintiff of his property. See Massood v. Fedynich, 530 S.W.3d 49, 57 (Mo. Ct. App. 2017); Benson v. Jim Maddox Northwest Imports Inc., 728 S.W.2d 668, 669 (Mo. Ct. App. 1987).

Here, XPO has admitted to instances of mishandling inventory, delay in unloading items, and inventory not reaching Schnuck's stores, all of which led to pitch. (Resp. SMI Add'l SOF at ¶¶ 42-44). This is some evidence that XPO exercised control over Schnuck's inventory, which in turn interfered with Schnuck's right to sell the inventory in its stores. Therefore, XPO's motion for summary judgment on Schnuck's claim for conversion will be denied.

**b. Fraudulent inducement**

Schnuck's fraud claim alleges that XPO knowingly misrepresented that it possessed the skills, resources, experience and capabilities to successfully operate the warehousing and distribution business at NorthPark, thereby inducing Schnuck to enter the Agreement. (SAC at ¶¶ 86-109). In support of its motion, XPO argues there is no evidence to suggest it made the alleged misrepresentations knowing they were false. XPO points to the deposition of Schnuck's corporate representative Steve Carroll, who testified he had no evidence that XPO knowingly made false statements and that in deciding to contract with XPO, Schnuck did not rely upon any representations outside of the Agreement. (XPO SOF at ¶¶ 242-244). XPO further argues that

Schnuck, a sophisticated business entity, had no right to rely on any non-contractual representations because it conducted its own due diligence and expressly disclaimed relying on any representations not specifically included in the Agreement. Lastly, XPO contends the alleged misrepresentations are merely non-actionable puffery and statements of opinion.

As evidence that XPO knowingly made false representations, Schnuck points to the deposition of John Kettman, a former XPO executive, who testified that XPO did not have enough people to fill the necessary positions at North Park, and struggled to fill leadership roles. Mr. Kettman also testified that none of XPO's extra personnel support had experience with fresh produce as XPO represented. (SMI Resp. to XPO SOF at ¶ 243). Mr. Kettman admitted XPO did not have intimate knowledge of Schnuck's store requirements and systems as it had previously represented. (Id.). Mr. Kettman also denied that XPO's use of these staffing/temporary agencies in St. Louis made XPO familiar with the temporary labor force in the area or put it in a better labor position. (Id.).

Under Missouri law, fraud may be inferred from facts and circumstances and need not be shown by direct evidence. Jacobs Mfg. Co. v. Sam Brown Co., 19 F.3d 1259, 1263–64 (8th Cir. 1994) (citations omitted). "Whether the facts and circumstances justify a conclusion that a defendant knows a representation is false when made is a question for the jury." Id. (citing Essex v. Getty Oil Co., 661 S.W.2d 544, 551 (Mo. Ct. App. 1983)). Viewing the evidence in the light most favorable to Schnuck, the Court concludes that a jury could reasonably infer that XPO's representations were false when made. Thus, XPO's motion for summary judgment on Schnuck's claim for fraudulent inducement will be denied.

### (3) Breach of contract - Count I of XPO's complaint

In Count I of its complaint, XPO alleges that Schnuck breached the Agreement by failing to pay its invoices. As discussed above, <u>see</u> Section III.A, Schnuck does not dispute that it withheld approximately $1.7 million from XPO invoices to account for amounts it contends it was owed under the Agreement's true-up provision. Schnuck also claims entitlement to another $248,289 in "clawback" damages for amounts due in true-up penalties for period 5 in FY 2017. XPO argues it is entitled to judgment as a matter of law because there was no approved budget and, even if there had been, Schnuck failed to consider the actual true-up formula mandated by Section 4 and did not deduct certain labor expenses as required. XPO further argues there is no evidence in the record to substantiate Schnuck's contention that insufficient detail was provided for the amounts invoiced. <u>See</u> Section III.B.

As discussed above, there are factual disputes concerning the satisfaction of prerequisites for application of the true-up obligation, including whether Schnuck actually "approved" a budget for FY 2017, as well as the supporting documentation for XPO's invoices, all of which preclude summary judgment for either party on their respective claims for breach of contract. Thus, XPO's motion for summary judgment on its own claim for breach of contract will be denied.

### IV.    Conclusion

For these reasons, XPO's motion for partial summary judgment is granted in part. Schnuck's claims for damages are barred to the extent Schnuck seeks to recover lost profits, "out of pocket" expenses, and "lost store sales and other" expenses. These categories of damages constitute consequential damages and are barred under the limitation of liability provisions of the parties' Agreement. Schnuck's motion for summary judgment on XPO's claim for union

avoidance costs is granted. XPO's claim for union avoidance costs is barred on the grounds that such costs are not specifically identified or fairly and reasonably encompassed within the categories of costs for which Schnuck agreed to be liable under the parties' Agreement. Factual disputes remain on all other issues.

Accordingly,

**IT IS HEREBY ORDERED** that Schnuck's Motion for Summary Judgment on its Breach of Contract Claims for True-Up Damages [154] is **DENIED.**

**IT IS FURTHER ORDERED** that Schnuck's Motion for Partial Summary Judgment on XPO's Claims for Breach of Contract and Action on Account [161] is **GRANTED in part** and **DENIED in part** in accordance with the rulings herein.

**IT IS FURTHER ORDERED** that Schnuck's Motion for Partial Summary Judgment on XPO's Claim for Union Avoidance Costs and Schnuck's Affirmative Defense of Offset [164] is **GRANTED.**

**IT IS FINALLY ORDERED** that XPO's Motion for Partial Summary Judgment as to Counts I Through V of Second Amended Counterclaim and Count I of XPO's Complaint [173] is **GRANTED in part** and **DENIED in part** in accordance with the rulings herein.

Dated this 21st day of June, 2019.

_John A. Ross_

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**